UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

JAVIER BELTRAN,

Defendant.

11 Cr. 1032-60 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

The Court has received a request from defendant Javier Beltran ("Beltran") seeking his release from Federal Correctional Institution Pollock ("FCI Pollock") under 18 U.S.C. § 3582(c)(1)(A)(i), in light of the risk that the COVID-19 pandemic presents for inmates. Dkt. 2589 ("Def. Mot."); Dkt. 2595 ("Def. Mem."). The Government opposes this request. Dkt. 2600 ("Gov't Mem."). For the following reasons, the Court denies this application.

Beltran was a long-time member of the Bad Boys, a sect of the Bronx Trinitarios Gang ("BTG"). Gov't Mem. at 2. He served as a treasurer and as "first" of the Bad Boys and, in those roles, funded gang activities such as buying weapons and recruiting members, and participated in several nonfatal but violent attacks. *Id.*; Dkt. 1721 ("Sent. Tr.") at 24.

Far and away most relevant here, Beltran played a critical role, albeit formally that of an aider and abettor, in the brutal, senseless, and retributive murder, on March 31, 2009, of Raymond Casul. That night, BTG members, including Beltran, gathered at the apartment of Luis Beltran ("Luis"), Beltran's younger brother, to plan a retaliatory attack on a rival gang, of which Casul was a member. Gov't Mem. at 2. At the apartment, Beltran gave Luis a gun. Sent. Tr. at 23; *see id.* at 11 (Luis Beltran, when asked what he was going to do with the gun, responded, "you

1

know, what do you think I'm going to do?"). The group, including Beltran as "backup," then set off in two separate cars to carry out the attack. *Id.* at 23. After the group arrived at their Bronx destination and found members of the rival gang, Luis got out of one of the cars and opened fire on Casul, killing him. Gov't Mem. at 2. The cars then sped away.

On September 12, 2013, Beltran pled guilty to one count of using, possessing, and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Beltran's guilty plea came days before his trial—jointly with Luis and two other BTG members, Felix Lopez-Cabrera and Carlos Lopez, both of whom were charged with multiple murders, was set to begin. *See* Sent. Tr. at 2, 24; Dkt. 1356 ("Plea Tr.") at 17. In an unusual plea agreement, the parties stipulated (1) to a Guidelines range of a specific term of imprisonment: 120 months, which was the mandatory-minimum sentence under § 924(c); and (2) not to seek a variance from this sentence. *See* Plea Tr. at 17–18; Sent. Tr. at 6–7.

At sentencing, held May 21, 2015, the Court imposed the jointly recommended sentence. Sent. Tr. at 27. The Court noted that the evidence that had been adduced at his co-defendants' trial was powerful as to Beltran's culpability for the Casul murder, and that a Guidelines range based on Beltran's offense conduct involving the murder would have significantly exceeded the 120-month Guidelines sentence stipulated by the parties. *Id.* at 3, 9–14. The Court further stated that, particularly given Beltran's role in the brutal Casul murder, prison sentences well above 120 months would also have been reasonable. *Id.* at 21. But, the Court noted, there were important systemic interests in respecting a negotiated plea agreement reached deep into the case by thoughtful counsel, and elicited from the Government that its agreement to the plea terms reflected its judgment that the proof against Beltran appeared, before trial, less conclusive than it

did after trial had transpired. *Id.* at 11–14. The Court concluded that, all factors considered, a sentence of 120 months in prison was compatible with 18 U.S.C. § 3553(a).

To date, Beltran, who has been in prison since December 12, 2012, has served 99 months of that sentence. Def. Mem. at 8. His estimated release date is November 20, 2021. *Id.*

On February 18, 2021, the Court received a *pro se* motion from Beltran seeking early, compassionate release because of the COVID-19 pandemic. Def. Mot. On March 10, 2021, Beltran's appointed counsel filed a memorandum in support of his motion. Def. Mem. Counsel argues that compassionate release is warranted in light of: (1) the unexpectedly hard conditions of detention during the current COVID-19 pandemic; (2) Beltran's family circumstances, including health problems affecting his father; (3) Beltran's completion of a significant portion of his prison sentence (99 out of 120 months); (4) the fact that Beltran is expected to be deported, not released into the community within the United States, upon completion of his prison term; and (5) rehabilitative steps Beltran has taken while incarcerated. *Id.* at 1–2.

On March 17, 2021, the Government opposed Beltran's motion. Gov't Mem. It argues that Beltran has not demonstrated an extraordinary and compelling reason justifying his immediate release, and that compassionate release would be inconsistent with the § 3553(a) factors, including the need to reflect the nature and circumstances of his offense, promote respect for the law, provide just punishment, and afford adequate deterrence. *Id.* at 1.

> Under 18 U.S.C. § 3582(c)(1)(A), a court
>
> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

The defendant bears the burden of proving that he is entitled to compassionate release under 18 U.S.C. § 3582(c).  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit prisoners to initiate compassionate release proceedings, and instead required the Bureau of Prisons ("BOP") to seek such release on their behalf. *United States v. Ebbers*, 432 F. Supp. 3d 421, 422–23, 427 (S.D.N.Y. 2020).  But with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended the law to allow defendants independently to seek compassionate release from federal courts.  *Ebbers*, 432 F. Supp. 3d at 422–23.

Before the First Step Act, Congress had tasked the Sentencing Commission with identifying circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *Id.* at 427 (citing 28 U.S.C. § 994(t)).  The Commission did so in U.S.S.G. § 1B1.13 and its corresponding commentary.  That guidance, *inter alia*, (1) sets out circumstances that present extraordinary and compelling reasons justifying release; and (2) requires that a defendant not be a danger to the community. *Id.* § 1B1.13(1)–(3) & cmt. n.1(A)–(D).

By its terms, however, the Commission's guidance applies only to a "motion of the Director of the Bureau of Prisons." *Id.* § 1B1.13.  And the Commission has not updated § 1B1.13 or its commentary to reflect the First Step Act's amendment to § 3582(c)(1)(A) authorizing defendants to move for compassionate release on their own, without the intervention of the BOP.  Accordingly, although courts—including this one—had treated the Commission's guidance as applicable to all compassionate release motions, *see, e.g.*, *United States v. Hernandez*,

4

451 F. Supp. 3d 301, 303 (S.D.N.Y. 2020); *see also Ebbers*, 432 F. Supp. 3d at 428, the Second Circuit has recently clarified that § 1B1.13 "is not 'applicable' to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases. *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020); *see also id.* at 237 ("Neither Application Note 1(D), *nor anything else in the now-outdated version of Guideline § 1B1.13*, limits the district court's discretion." (emphasis added)).

Consistent with *Brooker*, in assessing a § 3582(c) motion brought directly by a defendant, the Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons or by its freestanding requirement that the defendant seeking release not pose any danger to the community. Rather, the Court, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A)(i), may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Brooker*, 976 F.3d at 237.

Here, the Court holds, Beltran has not identified extraordinary and compelling reasons justifying his compassionate release. To be sure, the COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration. The crowded nature of federal detention centers in particular presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread.[1]

---

[1] *See* Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (May 20, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; *see also United States v. Nkanga*, 450 F. Supp. 3d 491, 492 (S.D.N.Y. 2020) (citing *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention 2 (Mar. 23, 2020),

And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons, in the past months, various courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody[2] and the compassionate release of high-risk inmates serving federal sentences.[3]

Beltran, however, does not have heightened vulnerability to COVID-19. On the contrary, he concedes, he is a healthy 35-year-old with no medical conditions that place him at enhanced risk of serious complications should he contract COVID-19 in the future.[4] *See* Def. Mem. at 4;

---

https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf) (highlighting danger faced by those in jails and prisons).

[2] *See, e.g.*, *United States v. Chandler*, --- F. Supp. 3d ---, No. 19 Cr. 867 (PAC), 2020 WL 1528120, at *1–3 (S.D.N.Y. Mar. 31, 2020) (granting bail application, under 18 U.S.C. § 3142(i), of defendant charged with being a felon in possession of a firearm); *United States v. McKenzie*, 450 F. Supp. 3d 449 (S.D.N.Y. 2020) (granting bond pending sentencing, under 18 U.S.C. § 3145(c), to defendant who had pleaded guilty to single count of assault with a deadly weapon and had been released on bond); *United States v. Witter*, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (S.D.N.Y. Mar. 26, 2020) (granting bond pending sentencing, under § 3145(c), to defendant who had pleaded guilty to a narcotics offense).

[3] *See, e.g.*, *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) (granting compassionate release to defendant with medical conditions putting him at heightened risk of severe COVID-19 and who had served 75% of effective sentence); *United States v. Benjamin*, No. 15 Cr. 445 (PAE), Dkt. 1144 at 6–7 (S.D.N.Y. Sept. 15, 2020) (same for defendant with asthma who had served nine years of his 10-year sentence); *United States v. Wilson*, No. 16 Cr. 317 (PAE), Dkt. 656 at 4–7 (S.D.N.Y. Aug. 31, 2020) (same for defendant with heighted vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 482 F. Supp. 3d 151, 154–56 (S.D.N.Y. 2020) (same for elderly defendant, who had serious medical conditions and played a low-level role in a drug trafficking conspiracy); *United States v. Davies*, No. 18 Cr. 390 (PAE), Dkt. 479 at 4–7 (S.D.N.Y. June 26, 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played low-level role in drug trafficking conspiracy); *United States v. Brown*, No. 18 Cr. 390 (PAE), Dkt. 472 at 4–7 (S.D.N.Y. June 17, 2020) (same).

[4] Beltran has once contracted COVID-19, was asymptomatic, and has since recovered. *See* Def. Mem. at 4; *see also* Gov't Mem. at 1. It is possible that that may reduce the likelihood that he will contract the virus again in the near future. That said, as reflected in rulings on release

*see also* Gov't Mem. at 1. Instead, he argues that three other circumstances establish extraordinary and compelling reasons justifying his release.

First, he notes, the pandemic has caused him to experience conditions of confinement far more difficult than could have been expected at the time of sentencing, with limits on mobility within the facility and a ban on social visits. *See* Def. Mem. at 4–5. That is undeniably correct. At the same time, Beltran has not shown himself to be any more vulnerable to the effects of COVID-19 than the average inmate incarcerated at FCI Pollock, and his medical circumstances are far less threatening than those of almost all defendants whose release the Court has ordered under § 3582. *See, e.g.*, *supra* note 3. Many were much older. Many had significant, even severe, medical conditions, such that the enhanced risk of exposure to COVID-19 while incarcerated posed "too great a risk" of "function[ing] as a death sentence." *Simon*, 482 F. Supp. 3d at 155 (ordering compassionate release of elderly defendant with, *inter alia*, HIV, cancer, and chronic obstructive pulmonary disease); *Brown*, 18 Cr. 390 (PAE), Dkt. 472 at 4 (S.D.N.Y. June 17, 2020) (same for elderly defendant with HIV, Hepatitis C, hypertension, and partial paralysis from a past stroke); *Davies*, 15 Cr. 445 (PAE), Dkt. 479 at 4 (S.D.N.Y. June 26, 2020) (same for elderly defendant with high blood pressure, obesity, and hypertension). That is simply not the case for Beltran.

Second, Beltran argues that he has made forward progress since his sentencing. *See* Def. Mem. at 6–7. It does, indeed, appear that Beltran has productively used his time in prison. But that circumstance, which is not unusual, does not make Beltran's case extraordinary. And, as the

---

motions by co-defendants in this case, an inmate's having previously contracted COVID-19 is but one factor pertinent to a § 3582(c) motion. It neither precludes nor compels a finding, based on the full record, of extraordinary and compelling circumstances. *Compare, e.g.*, Dkt. 2565 at 1–2 (denying release to defendant who had contracted COVID-19 in prison), *with* Dkt. 2581 (granting release to defendant who had contracted COVID-19 in prison).

Government notes, Beltran has amassed a substantial disciplinary history in prison. Although this record is not alarming, it undermines confidence in the extent of his asserted rehabilitation. *See* Gov't Mem. at 5; *id.*, Ex. A.

Third, Beltran states that he wishes to assist his father, who suffered a stroke in 2019, run their family business in the Dominican Republic. *See* Def. Mem. at 7–8. That aspiration is laudable, but it is not extraordinary, as many if not most inmates have familial obligations, and Beltran has not suggested that he alone can attend to his father's needs. *See, e.g.*, *United States v. Strong*, No. 11 Cr. 1032-31 (PAE), 2021 WL 75660, at *5 (S.D.N.Y. Jan. 7, 2021).

Accordingly, although the COVID-19 pandemic is, to say the least, extraordinary, its impact on Beltran, and his circumstances, are not.

In any event, and far more important to the Court's analysis, even if this threshold had been cleared, the Court would not grant Beltran's release, because, in the Court's firm judgment, his release before the completion of his assigned sentence would be inconsistent with—and disserve—the § 3553(a) factors, considered in totality. *See* 18 U.S.C. § 3752(c)(1)(A). Several of those factors—the nature and seriousness of the offense, the need for the sentence to provide just punishment for the offense, and the need for the sentence to promote respect for the law—require that Beltran serve the full term of imprisonment that the Court imposed.

Beltran's offense was unforgettably horrific. He was a central participant in a premeditated murder—a rubout on a public street—of a young man affiliated with a gang rival who had done no more than disrespect the Bronx Trinitarios. Fully appreciating the purpose to which it would be put, Beltran gave his brother the murder weapon, and drove with others to the crime scene to serve as backup, if needed. The crime was senseless and brutal. And as the testimony at trial and at the

sentencings of Beltran and his brother developed, the Casul slaying has caused lasting anguish to Casul's grieving family. *See* Sent. Tr. at 14–17.

Beltran's brother, Luis, went to trial and was convicted of murder in aid of racketeering in connection with the Casul murder. For that offense, he is today serving a mandatory life sentence. *See* Dkt. 1766 at 22–23, 26. To avoid this prospect, Beltran was given the opportunity by the Government to plead guilty to a single firearms count, and did so. For that offense, the Sentencing Guidelines—in a departure from their usual conduct-based mode of calculation—reflexively recommend a specific sentence: 120 months in prison, matching the statutory mandatory-minimum sentence. And in the plea agreement, which in this respect was unusual, both parties agreed to recommend that 120-month sentence, and the Government agreed not to seek a variance above it. At sentencing, the Court, out of respect for the parties' agreement, elected not to vary, *sua sponte*, above that agreed sentence. *See* Sent Tr. at 26. But given the gravity of the Casul murder—and Beltran's other predations[5]—the Court, in imposing sentence, pointedly noted that "other sentences, much higher sentences, would have been reasonable." *Id.* at 26; *see id.* at 21 ("[T]o be sure, sentences above 120 months and, indeed, well above it would also be reasonable."); *id.* at 22 (finding 120-month sentence reasonable "with difficulty").

In light of that history, any reduction in Beltran's prison sentence below the 120-month term imposed would be unsustainable and unjust. Such a sentence would insufficiently reflect the gravity of the central crime—the Casul murder—in which Beltran participated, leave Beltran with a sentence short of just punishment, fail to promote respect for the law, and be a thumb in the eye of Casul's survivors. Although the Court was willing at sentencing, with difficulty, to

---

[5] Beyond the Casul murder, the Court noted, Beltran had helped the Bad Boys obtain weapons and had participated in other "nonfatal acts of violence," including an attempted stabbing murder of another member of a gang rival. Sent. Tr. at 24; *see* Gov't Mem. at 2.

9

accede to the party's joint recommendation as to the proper sentence, the Court cannot find a further sentence reduction for Beltran compatible with § 3553(a).

For this reason, arguments that have carried the day in other compassionate release cases do not move the Court here. In other cases, the Court has granted early release to defendants nearing the end of their prison terms, albeit typically defendants with heightened vulnerability to COVID-19.[6] These included another BTG defendant, Ramone Lizardi, to whom Beltran likens himself. But while Lizardi's racketeering offense also included participating with other BTG members in a murder, that offense was not premeditated, and Lizardi's support role in it was decidedly ancillary relative to Beltran's. *See United States v. Lizardi*, No. 11 Cr. 1032 (PAE), Dkt. 2523 at 1–2 (S.D.N.Y. Oct. 9, 2020) (discussing Lizardi's "secondary role" in attack); Dkt. 1600 ("Lizardi Sent. Tr.") at 12–14 (attack in which Lizardi was involved resulted in second-degree murder, as to which Lizardi was "more in the back of the pack," and his role was "different in that he did not individually possess a gun").

The Court has also repeatedly, at sentencing and in resolving compassionate release motions, treated each day of imprisonment spent in the harsh conditions caused by COVID-19 as equivalent to more than a day's imprisonment during ordinary times. *See, e.g.*, *id.* at 6–8. Although that is true here, too, the interests in promotion of respect for the law and just punishment, given the singular gravity of the Casul slaying, restrain the Court from reducing Beltran's sentence below 120 months. And the other arguments Beltran makes in mitigation,

---

[6] *See, e.g.*, *Simon*, 482 F. Supp. 3d at 155 (ordering compassionate release of elderly defendant with, *inter alia*, HIV, cancer, and chronic obstructive pulmonary disease); *Brown*, 18 Cr. 390 (PAE), Dkt. 472 at 4 (S.D.N.Y. June 17, 2020) (same for elderly defendant with HIV, Hepatitis C, hypertension, and partial paralysis from a past stroke); *Davies*, 15 Cr. 445 (PAE), Dkt. 479 at 4 (S.D.N.Y. June 26, 2020) (same for elderly defendant with high blood pressure, obesity, and hypertension); *Hernandez*, 451 F. Supp. 3d at 303 (same for defendant with asthma).

such as his positive strides in prison, as addressed above, are insufficiently weighty to assist him here. Finally, that Beltran is on track to be deported after completing his prison term, which will result in his not having to serve out his assigned term of supervised release, is not a good reason also to reduce his prison term.

The Court thus finds that Beltran's case does not present extraordinary and compelling reasons for his early release and that the § 3553(a) factors require Beltran to serve the full sentence the Court originally imposed, net of any good-time credit that the Bureau of Prisons determines he has earned. The Court accordingly denies Beltran's motion for compassionate release or reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

SO ORDERED.

                                                                         PAUL A. ENGELMAYER
                                                                         United States District Judge

Dated: April 5, 2021
       New York, New York